## WELLS *v.* NICKLES.

1. While no act of Congress expressly authorizes the Secretary of the Interior or other officer of the Land Department to appoint timber agents, the appropriation of money by Congress to pay them is a recognition of the validity of their appointment.

2. Where the instructions of the Commissioner of the General Land-Office directed the agents to seize and sell timber cut on the public lands, and also authorized them to compromise with the trespasser on his paying a reasonable compensation for the timber cut and taken away, — *Held*, that a compromise so made by which he pays all the costs and expenses of the seizure, and gives bond to pay for the timber when its value shall be ascertained, pursuant to the agreement, is binding on the United States.

3. This compromise, should, in violation of its terms, the property be seized and sold by such agents, is evidence of his title and right of possession in his action against their vendee for the recovery of the property.

ERROR to the Supreme Court of the Territory of Utah.
The facts are stated in the opinion of the court.

*Mr. J. G. Sutherland* and *Mr. J. R. McBride* for the plaintiff.
*Mr. Samuel Shellabarger* and *Mr. Jeremiah M. Wilson, contra.*

MR. JUSTICE MILLER delivered the opinion of the court.

Nickles brought replevin in the District Court of the Third Judicial District of Utah to recover possession of a large amount of sawed lumber, laths, and logs, of which he claimed to be the owner. The defendants, Wells and others, denied this, and set up ownership in themselves. The court, at the request of the plaintiff, gave the following instruction to the jury : —

"To make a case entitling plaintiff to recover, it is only necessary for him to show, by a preponderance of testimony, that the logs in question, and the logs from which the lumber in question was made, were cut on government lands, seized by the timber agents, and sold to him, and that the defendants detained the logs and timber from him." The jury found a verdict for the plaintiff, as there was no doubt that all the logs had been cut on government lands, and that he bought them of a timber agent. Judgment was rendered accordingly. This was affirmed by the Supreme Court of the Territory, where the soundness of this instruction was the main question to be decided, as it is here.

One of the defences set up by Wells and his co-defendants, was that this same lumber had been seized and taken out of his possession by timber agents, under order of Oliver A. Patton, and V. M. C. Silva, register and receiver of the land-office within whose district the timber was cut; that he brought a suit against them for that seizure, in the progress of which a compromise was effected, which was reduced to writing and signed by the attorneys of the parties, and that according to its terms the lumber was delivered to Wells.

The paper is as follows:—

"In the District Court for the Third Judicial District of the Territory of Utah.

"DANIEL H. WELLS

v.

OLIVER A. PATTON, V. M. C. SILVA, J. J. HEFFERMAN, and WILLIAM McKAY, Timber Agents of the United States for the Territory of Utah.

"It is hereby stipulated by said parties as follows: In consideration of the bond to be executed by said plaintiff as below stated and his stipulation herein, said defendants hereby release the property from seizure mentioned in the complaint filed in this action, and will discontinue the publication of the notice of sale thereof, and will not hereafter meddle with said property or interfere with plaintiff's use thereof for his own benefit; said plaintiff, in consideration of the above, hereby agrees that he will not discontinue this suit without the defendants' consent, but will prosecute the same with diligence to final judgment, and will now give bond, with sufficient surety, to pay such sum as he shall be adjudged to pay by final judgment on the merits of this action. The plaintiff also agrees to advance the money to pay the costs of the seizure mentioned in the complaint, and all the costs connected therewith, including advertising, and if the plaintiff shall not be found liable to pay such costs and charges, so paid by such advance, the money so paid shall be deducted from the amount otherwise awarded, if anything, against him by such final judgment.

"SUTHERLAND & BATES,

"MARSHALL & ROYLE & HEMINGRAY,

"Att'ys for Def'ts.

"Rec'd of Daniel H. Wells three hundred and twelve dollars. for the. expenses of seizure mentioned in the last paragraph of the foregoing stipulation.

"SALT LAKE CITY, July 10, 1875.

"MARSHALL & ROYLE & HEMINGRAY,

"*Att'ys for Def'ts.*"

The Oliver A. Patton who made this agreement in that suit is the same man who, as register of the land-office, directed the subsequent seizure of the property, and sold it to Nickles. It is under that sale alone that Nickles asserts a title to the property.

It appears that, in addition to paying the costs of suit and the expenses of the seizure, Wells gave the bond required by the stipulation, and that after this the defendants demurred to his complaint. Their demurrer was sustained, and that suit dismissed. It does not appear that any attempt was made to assess their damages or the value of the timber delivered by them to him, nor that any suit was brought on his bond, or that it was delivered up to him or cancelled.

It would seem to be undeniable that if all the rights thus contested were those of private persons, the transaction above detailed would bar the present suit. Apparently conceding this to be so, as far as we can gather from the opinion of the Supreme Court of the Territory, both courts denied the sufficiency of these facts as a bar, on the ground that the property belonged to the United States, and that the parties to the former suit had no authority to make the compromise which is relied on.

That the lumber when first seized by the timber agents was the property of the United States is not denied. It was, therefore, held by them as agents of the government at the time Wells sued not to replevy it, but to enjoin them from selling it, and to determine his right to it. If, as he maintained, they were seizing and attempting to sell and deliver as public property that which was lawfully his, we know of no principle of law which forbade him to bring them before a legal tribunal. Their authority to act for the government, and the ownership of the property which they asserted a right to seize, were questions eminently proper to be decided by a court, especially a

court of the United States.  If it were otherwise, all the prop-
erty of the citizens of this vast country would be held at the
pleasure of any one bold enough to assert that it is government
property and he a government agent.  .

The effort we have made to ascertain and fix the authority
of these timber agents by any positive provision of law has
been unsuccessful.

The Department of the Interior, under the idea of protect-
ing from depredation timber on the lands of the government,
has gradually come to assert the right to seize what is cut and
taken away from them wherever it can be traced.  In aid
of this, the registers and receivers of the land-offices have,
by instructions from the Secretary of the Interior, been con-
stituted agents of the United States for these purposes, with
power to appoint special agents under themselves.  If any
authority from Congress to do this was necessary, it may be
fairly inferred from appropriations made to pay for the services
of these special timber agents.

But neither in these acts of Congress, nor in the instruc-
tions from the department, are the powers of these special
agents well defined.  Fortunately that point is not material
to the decision of the question before us, for the sale under
which Nickles succeeded in obtaining his verdict was made
by the same register of the land-office with whom Wells
made the compromise whose validity is disputed.  The action
of the other agents may, therefore, be disregarded in the con-
sideration of these questions.  It would seem, in the absence
of any express limitation of his authority, that the general
power to deal with lumber or timber of this character by suit
at law, or by such seizure as would subject him to an action,
must also authorize the agent to do whatever could be properly
done in the conduct of such a suit.

But these officers were not left without instruction and
authority on this point.  In a letter from the Commissioner of
the Land-Office, dated Nov. 4, 1870, to the land-officers at
Salt Lake City, one of whom was Patton, the following lan-
guage is used : " You will discharge with energy the duty de-
volved upon you by the enclosed circular, having due regard,
however, to the right of homestead and pre-emption settlers,

and to the circumstances of the community requiring a supply of timber, for mining, manufacturing, and other business pursuits. In cases where timber may be cut from the public lands and extenuating circumstances exist, you are authorized to compromise with the parties committing the trespass, on their paying all expenses incurred, and a reasonable stumpage to be fixed by you according to the condition of the markets, and not to fall below the minimum rate of $2.50 per M. feet. When objection is made to the rate fixed under this rule, the matter may be submitted to the judges of the Supreme Court of the Territory, in which case you will be governed by their decision as to the stumpage to be exacted." The circular so enclosed was a general one, to all registers and receivers, of Dec. 24, 1855, by Thomas A. Hendricks, Commissioner of the Land-Office, directing them to be vigilant in preventing persons cutting timber on public lands, and to seize such timber when cut, and sell it to the highest bidder. These instructions are repeated without the limitation to $2.50 per M. feet, in orders from the commissioner of the dates of July 8, 1874, Sept. 8, 1874, and June 21, 1875, the latter of which, after referring to the circular of 1855, and the other letters just mentioned, adds : "When circumstances justify so doing, you may settle with the parties on their paying any expenses incurred, and a reasonable stumpage for the timber. But you are to regard this as a compromise justified by existing circumstances, and not as the granting of permission to cut the timber, which is forbidden by law."

These instructions contain ample authority for the compromise made with Wells. It was made July 10, 1875, and the latest of the letters of the commissioner, from which we have cited, is dated June 21, 1875.

The compromise appears to have been framed in conformity with the language of the letter of Nov. 4, 1870. Wells agreed to pay, and did pay, the expenses of seizure and the costs of suit, and nothing remained but for the judge who decided the demurrer to fix the amount of the stumpage and give judgment therefor against Wells. He had given bond to pay what was so ascertained. The case was settled in precise accordance with the instructions of the commissioner, and we think the set-

tlement bound the United States, whose agent made the compromise.

The authority to make this settlement is quite as clear as the authority of the same officer to sell to Nickles; so that his right to sue depends upon the same authority on which Wells had the property delivered to him, on paying all costs and expenses and giving a bond, with surety, for the damages.

The instruction of the District Court held this settlement to be of no validity. The Supreme Court held the same view; and the register who made the sale to Nickles evidently disregarded his own compromise and sold the property to Nickles under the same idea. All this, we think, was erroneous.

We have been shown a letter of April 5, 1877, from the Secretary of the Interior to the Commissioner of the Land-Office, in which he says, " No agent employed by you will be permitted to make any compromise for depredation on the public lands." But whether this order is limited to the agents specially employed to look after such depredations, or be held to include the registers and receivers also, is immaterial in the present case, for this recall of the power to compromise was nearly two years after the one under consideration was made and a considerable sum of money paid under it.

All the letters from the department to its officers above referred to, except the one last mentioned, are in this record, and are made part of the case on which the Supreme Court of the Territory decided.

We are of opinion that the instruction to the jury, which we have given in full, and the whole theory on which the effect of the stipulation of compromise was decided, is erroneous, and that the judgment of each of the courts below must be reversed, with directions to set aside the verdict and grant a new trial; and it is

*So ordered.*