WASKEY et al. v. HAMMER et al.†

(Circuit Court of Appeals, Ninth Circuit. May 3, 1909.)

No. 1,609.

1. MINES AND MINERALS (§ 18*)—EXCESSIVE LOCATION—EFFECT.
    An excessive mineral location made in good faith and otherwise conformable to law is not wholly void by reason of such excess, being only invalid as to the excessive area.
    [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 35; Dec. Dig. § 18.*]

2. MINES AND MINERALS (§ 18*)—EXCESSIVE CLAIMS—LOCATION—REJECTION OF EXCESS.
    Where an excessive mineral location is made in good faith, the locator may select the portion of the claim he will reject as such excess.
    [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 35; Dec. Dig. § 18.*]

3. MINES AND MINERALS (§ 17*)—CLAIMS—LOCATION—ALTERATION IN BOUNDARIES—DISCOVERY OF MINERAL.
    Under the rule that it is immaterial whether the discovery of mineral in the ground claimed is made before or after the marking of its boundaries, and that the performance of such acts, where recording notice of location is not required, perfects the location, the fact that a locator, on discovering that his boundaries exceeded the amount of ground to which he was entitled, drew in one of the lines so as to exclude the excess, and in so doing excluded the hole in which he made his discovery, did not vitiate his entire claim, provided he made another discovery within the boundaries as readjusted before any rights in the premises had been acquired by another.
    [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 24–26; Dec. Dig. § 17.*]

4. MINES AND MINERALS (§ 11*)—LOCATIONS—QUALIFICATIONS OF LOCATOR—DEPUTY LAND SURVEYOR.
    Rev. St. § 452 (U. S. Comp. St. 1901, p. 257), provides that the officers, clerks, and employés of the General Land Office are prohibited from purchasing or becoming interested in the purchase of any public lands. W., while competent to make a mineral location, located an excessive area, and thereafter readjusted the boundaries of his claim so as to exclude the point of discovery, and, before making a new discovery within the readjusted lines, was appointed a deputy surveyor of the Land Department. *Held*, that such section was applicable to the office of deputy surveyor, and that W.'s claim, perfected by a new discovery after his appointment, was therefore void.
    [Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 11.*]

In Error to the District Court of the United States for the Second Division of the District of Alaska.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied May 26, 1909.

F. E. Fuller, O. D. Cochran, I. D. Orton, C. D. Murane, W. A. Gilmore, J. C. Campbell, W. H. Metson, F. C. Drew, C. H. Oatman, and J. A. Mackenzie, for plaintiffs in error.

P. M. Bruner and Edward Lande, for defendants in error.

Charles E. Shepard, amicus curiæ.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The subject-matter of this action is a piece of mining ground in Alaska, covered by two overlapping mining locations; that under which the defendants in error (who were plaintiffs in the court below) claim having been made in January, 1904, under the name of "Golden Bull" claim, and that under which the plaintiffs in error (who were the defendants below) assert their rights having been made in January, 1902, under the name of "Bon Voyage" mining claim. The latter was made by the plaintiff in error Whittren, who afterwards executed a deed to Eadie of an undivided interest in it, the remaining plaintiffs in error holding under them as lessees, and, being in the actual possession of the disputed premises mining the same, the action was brought by the defendants in error to recover possession, with damages.

Upon the conclusion of all the evidence in the case, the court below directed a verdict for the plaintiffs, upon these grounds:

"First. That the location of the Bon Voyage claim, made in January, 1902, was invalid because no discovery of gold has been proved to have been made within the limits of the claim as surveyed on November 11, 1903, since such survey.

"Second. That the proofs showing that the locator of the Bon Voyage mining location, Mr. Whittren, was at the time of the survey in November, and of the subsequent discovery of gold by him on December 13, 1903, a deputy mineral surveyor of the United States, he is disqualified to acquire title to public mineral lands of the United States while holding that official position, and therefore that his present title and that of his grantee, Eadie, to the Bon Voyage, resting, as the title of both do, upon the location of December 13, 1903, is invalid."

The record shows that Whittren located the Bon Voyage as a placer claim on the 1st of January, 1902, and so marked its boundaries upon the ground that they could be readily traced, having previously discovered gold within such boundaries, and thereafter duly recorded the notice of his location. In respect to those matters there is no dispute. Being at that time a competent locator, the ground within the boundaries of his claim ceased to be open to location or appropriation by any one else so long as Whittren complied with the law applicable to the case.

The record shows that, notwithstanding Whittren's location, the defendant in error Halla, in July, 1902, undertook to make, for a man named Roth, a location that he called the "Golden Bull," embracing a part of the Bon Voyage claim, under which location by Halla, it is contended by counsel for the defendants in error, they acquired some right. We think it clear that there is nothing in that suggestion, for the reason that no part of the ground covered by the Bon Voyage claim was open to location at the time that Halla undertook to include it in his location of July, 1902. Nothing further in regard to that

claim of right on the part of the defendants in error, therefore, need be said.

At the trial Whittren testified, among other things, that on or about November 11, 1903, he went upon the Bon Voyage claim for the purpose of starting a man to do the assessment work thereon, and also for the purpose of making a survey of the claim, having with him two assistants for that purpose, who carried the tape, while he, Whittren, who was a surveyor, used the instrument. It appears that this actual survey disclosed the fact that the boundaries marked by Whittren in January, 1902, included a little over 20 acres of ground, and for the purpose of reducing the amount to the statutory limit of 20 acres Whittren drew in two of the corners; his testimony being in part as follows:

I "started at point 2, northeast corner, put in a new stake at that point, 2x2. I found a stake placed by me in 1901 at that point after considerable trouble. Found it where that No. 2 stake now stands. The markings were not decipherable at once. It seems to me the stake was marked 'Max Roth, by Otto Halla, July 10th'—or something like that—'1902.' The stake which Otto Halla used was the original stake which I had placed there, the northeast corner stake. It had been whittled off nearly, but there was enough left so that I could decipher the 'B. V.' From point 2 at the northeast corner I took bearings on Sledge Island. The compass on the transit was broken, and I took the angle with the vernier. My field notes show from the northeast corner to the northwest corner, his the south peak of Sledge Island. That is the same as I originally staked it, lined up the same. It hit the center of the peak. When I put the instrument on I hit the center of the south peak of the contour of Sledge Island. This stake, which I found at the northeast corner of the Bon Voyage, having written on it 'Max Roth,' and having exposed thereon a part of the scribing 'B. V.,' I took up because I considered it my property and brought it back to Nome and put it in Dr. Westby's building, down on Front street. It remained there until it was burned up in the fire. The purpose for which I took this stake was in case of trouble arising over this claim I could have that to defend it. You could make out the scribing underneath the writing, if you knew the 'B. V.' was there. You could see part of the cutting, the number had been erased, originally marking that corner 'No. 4 B. V.' The 'No. 4' you could not make out, but you could make out part of the 'B. V.' All the stakes planted by me when I surveyed the claim were 2 by 2's, each designating the point 'N. E. B. V. 8'; 'N. W. B. V.'; 'S. E. B. V.'; 'S. W. B. V.' At the northeast corner I placed a stake 2 by 2 inches with a nail driven in the top to designate the point, and it was scribed 'N. E. B. V.' and driven in the ground. The bottom of that stake is there yet. It has been burned by a tundra fire. We found the bottom of it in 1906 and nailed a new stake to it. That stake remained there from the 11th of November, 1903, until the same was burned by tundra fire. In 1903, when surveying. I didn't take in the initial stake at all. I took up the four stakes there, the corners, by making the survey and tying each corner in, regardless of the initial stake. I ran a line from the points 10 to 2 that day. I made the angles of the claim 90 deg. From the northeast to the northwest corner is 660 feet. I had to pull in the northwest corner. It was about 20 feet out. I pulled it in so as to make it exactly 660 feet. I then turned a right angle and ran down to the southwest corner. I measured down 1,320 feet, and put up a stake at the point 4 instead of the point 12. I found the claim was going to be over 20 acres. I was cutting down the excess. I then turned a right angle and ran to the southeast corner. We may have moved that a foot more or less; that line was about right. We made the distance 660 feet. We ran it back, checked back to the northeast corner. I made the original field notes November 11, 1903, on the ground."

By this drawing in of one of the lines of the claim Whittren left out of its boundaries the hole in which he had made the original discovery.

His testimony in respect to the survey was corroborated by that of his two assistants, Taft and Lange; Taft also testifying that after finishing the survey he stayed on the claim and went to work placing mounds around the corner stakes and working on the shaft. Whittren also testified, among other things, as follows:

"I made a discovery of gold upon the Bon Voyage claim in the year 1903; that was within the boundaries of the Bon Voyage as they now stand; this was in December, 1903; it was about the middle of December; the discovery was made 354 feet from the northwest corner; it was at the representing shaft of 1903. The occasion of my being out there was to pass upon the work I was to pay for. I took the dirt off the surface of the ground where it had been thrown out of the shaft. I had made a discovery prior to that time. I went out there on that day partially to make a discovery. I was not there while the work was being done. I borrowed a sack from Phil Williams, and put the dirt in that and brought it to town and thawed it out."

At the time Whittren made the discovery in December, 1903, and at the time he made the survey in the preceding month of November, he was a deputy mineral surveyor, but he was not such at the time of his original discovery, nor at the time of his original location of the Bon Voyage in January, 1902; his appointment as such deputy being made in February, 1903. The first question in the case, therefore, is whether the leaving out of his original discovery hole or shaft when he drew in the line so as to reduce the area to the statutory limit of 20 acres invalidated the entire claim.

It is not contended that Whittren, in making his location in January, 1902, purposely included more than 20 acres. His act in drawing in one of his lines when his actual survey disclosed the fact that there was a slight excess within his boundaries, certainly tends to show a bona fide desire on his part to conform to the statutory requirement in that regard. That a location made in good faith and otherwise conformable to law is not rendered wholly void by reason of such excess, but that the excessive area only is void, is well settled. Zimmerman et al. v. Funchion et al. (C. C. A.) 161 Fed. 859, and cases there cited. And that such locator is at liberty to select the portion of the claim that he will reject as such excess is also established law. McIntosh v. Price, 121 Fed. 716, 58 C. C. A. 136, where we said:

"We are very clearly of the opinion that, if any portion of the ground located by the Kjelsbergs was subject to relocation as being in excess of the permitted width, the owners thereof in possession, under the circumstances found by the trial court, could not be deprived of the right to select the portion thereof which they would elect to hold, and that another locator had no right to enter upon that portion of the claim in which they were working and which was a valuable portion thereof, and oust them from possession by making a location thereof. The defendants in error were given no notice that the width of their claim was excessive, or that any part of their location was void, and they were given no opportunity to draw in their lines so as to comply with the local mining regulations. The policy of the mining laws of the United States does not permit a locator to thrust out of the possession of his discovery and the pay streak of his claim one who has located a placer claim in attempted compliance with the mining rules and laws, and who is actually engaged in mining upon that portion of his claim."

Does the fact that, when Whittren drew in his line so as to exclude the excess, he left out of the boundaries the hole in which he made his discovery, vitiate the entire claim? It has been many times decided that, in the absence of any intervening right, it is unimportant whether the discovery of mineral in the ground claimed is made before or after the marking of its boundaries. In such a case, the performance of those two acts (where the recording of the notice of location is not required) perfects the location; but both of them are essential to the validity of a mining location under the United States statutes. As said by the Supreme Court in Gwillim v. Donnellan, 115 U. S. 45, 50, 5 Sup. Ct. 1110, 1112, 29 L. Ed. 348:

The discovery "must lie within the limits of the location which is made by reason of it. If the title to the discovery fails, so must the location which rests upon it."

When, therefore, Whittren in November, 1903, left out of his boundaries the only place upon which he had then made a discovery of mineral, he abandoned one of the essential elements of his location. It is true that the evidence tended to show that he still maintained his claim to the ground included within his readjusted boundaries, which were marked as required by the statute and embraced only the statutory area, but within those boundaries he had not then made a discovery of mineral.

Passing, for the moment, the question of his then disqualification because of his then official position, the discovery of mineral within his readjusted boundaries, prior to the acquiring of any right in the premises by any one else, would have perfected his right to the ground. Such is the purport of the decisions in the cases of Tonopah & Salt Lake Mining Company v. Tonopah Mining Company (C. C.) 125 Fed. 408; Silver City Gold & Silver Mining Company v. Lowry et al., 19 Utah, 334, 57 Pac. 11, and the numerous cases there referred to. As, therefore, the location upon which the right of the defendants in error rests was not made until January, 1904, it results that if Whittren was a competent locator at the time he testified that he made a discovery of gold within his readjusted lines in December, 1903, the judgment below should be reversed.

Was he then disqualified by reason of his official position, is therefore the turning point in the case.

Section 452 of the Revised Statutes (U. S. Comp. St. 1901, p. 257), is as follows:

"The officers, clerks and employés in the General Land Office are prohibited from directly or indirectly purchasing or becoming interested in the purchase of any of the public lands, and any person who violates this section shall forthwith be removed from his office."

The later rulings of the Land Department are to the effect that this statute is applicable to a deputy surveyor, and therefore that such an officer is prohibited from acquiring or becoming interested in the purchase of any of the public lands. Muller v. Coleman, 18 Land Dec. Dep. Int. 394; In re Neill, 24 Land Dec. Dep. Int. 393; Floyd v. Montgomery, 26 Land Dec. Dep. Int. 122. See, also, In re McMicken, 10 Land Dec. Dep. Int. 97; Id., 11 Land Dec. Dep. Int. 96.

In the case of Hand v. Cook, 29 Nev. 518, 92 Pac. 3, a majority of the Supreme Court of Nevada held that the statute in question did not apply to a deputy mineral surveyor; but the reverse was held by the Supreme Court of Utah in the case of Lavagnino v. Uhlig, 26 Utah, 1, 71 Pac. 1046, 99 Am. St. Rep. 808. It will not do for a court to take a strained and narrow view of the language employed by Congress in its enactments, but rather give such a construction as will carry into effect its obvious intent. We entertain no doubt that a deputy mineral surveyor is an employé "in the General Land Office" within the meaning of the statute. That is the office in which the land laws of the United States are administered and executed, by and through the thousand and one officers and employés in and out of the particular building or buildings in which that department of the government is conducted. Nor do we see that there is any much clearer way to prohibit an act than to say expressly that it is prohibited. That Congress did in the section in question.

In the case of Prosser v. Finn, 208 U. S. 67, 28 Sup. Ct. 225, 52 L. Ed. 392, the Supreme Court held that section 452 applied to a special agent of the Land Department who had made an entry under the Timber Culture Act (Act March 3, 1873, c. 277, 17 Stat. 605, as amended by Act March 13, 1874, c. 55, 18 Stat. 21). The court said:

"The difficulty in the way of any relief being granted to the plaintiff arises from the statute prohibiting any officer, clerk, or employé in the General Land Office, directly or indirectly, from purchasing or becoming interested in the purchase of any of the public land. That a special agent of the General Land Office is an employé in that office is, we think, too clear to admit of serious doubt. Referring to the timber-culture statute, Secretary Smith well said: 'When the object of the act is considered, it will be seen that it applied with special force to such parties as the defendant in the cause at issue. As a special agent of the Commissioner of the General Land Office, he was in a position peculiarly adapted to secure such knowledge, the use of which it was the intention of the act to prevent. It follows from what has herein been set out that the decision of this department of date July 7, 1893, was in error, and the same is hereby set aside, and the decision of your office is affirmed.'

"It is not clear, from any document or decision to which our attention has been called, what is the scope of the duties of a special agent of the land office, but the existence of that office or position has long been recognized. Suffice it to say that they have official connection with the General Land Office, and are under its supervision and control with respect to the administration of the public lands. Wells v. Nickles, 104 U. S. 444, 26 L. Ed. 825; 1 Land Dec. Dep. Int. 608, 620; Instructions to Special Timber Agents, 2 Land Dec. Dep. Int. 814, 819–822, 827, 828, 832; Circular of Instructions, 12 Land Dec. Dep. Int. 499. They are in every substantial sense employés in the General Land Office. They are none the less so, even if it be true, as suggested by the learned counsel for the plaintiff, that they have nothing to do with the survey and sale of the public lands, or with the investigation of applications for patents, or with hearings before registers and receivers. Being employés in the General Land Office, it is not for the court, in defiance of the explicit words of the statute, to exempt them from its prohibition. Congress has said, without qualification, that employés in the General Land Office shall not, while in the service of that office, purchase or become interested in the purchase, directly or indirectly, of public lands. The provision in question had its origin in the acts of April 25, 1812, c. 68, 2 Stat. 716, and of July 4, 1836, c. 352, 5 Stat. 107. The first of those acts established a General Land Office, while the last one reorganized that office. Each of those acts made provision for the appointment of certain officers, and each limited

the prohibition against the purchasing or becoming interested in the purchasing of public lands to the officers or employés named in them, respectively. But the prohibition in the existing statute is not restricted to any particular officers or particular employés of the land office, but embraces 'employés in the General Land Office,' without excepting any of them.

"In the eye of the law his case is not advanced by the fact that he acted in conformity with the opinion of the Commissioner of the General Land Office, who stated, in a letter, that section 452, Rev. St., did not apply to special agents. That view, so far from being approved, was reversed, upon formal hearing, by the Secretary of the Interior. Besides, an erroneous interpretation of the statute by the Commissioner would not change the statute or confer any legal right upon Prosser in opposition to the express prohibition against his purchasing or becoming interested in the purchasing of public lands while he was an employé in the General Land Office. The law, as we now recognize it to be, was the law when the plaintiff entered the lands in question, and, being at the time an employé in the land office, he could not acquire an interest in the lands that would prevent the government, by its proper officer or department, from canceling his entry and treating the lands as public lands which could be patented to others. It may be well to add that the plaintiff's continuing in possession after he ceased to be special agent was not equivalent to a new entry. His rights must be determined by the validity of the original entry at the time it was made."

The principle of this case is, in our opinion, applicable to the one now before us.

The judgment is affirmed.