**UNITED STATES v. KOPLIN. SAME v. LA GRANGE GROCERY CO. SAME v. WEST POINT GROCERY CO.**

District Court, N. D. Georgia.    March 8, 1928.

Nos. 855, 932, 933.

1. **Evidence** ⊚⟿400(3)—**Written sale contract cannot be varied by parol, unless impeached for mistake or fraud.**

A written memorandum of sale of goods at a government auction, signed by buyer and government agent, and stating the terms of sale, cannot be changed or varied by parol, unless impeached for mistake or fraud.

2. **Auctions and auctioneers** ⊚⟿8—**Purchaser is not required to accept unidentified goods sold at auction, not complying with memorandum contract of sale.**

Where goods sold at auction were bid off in fractions of large lots, no specific goods being identified at the time as those sold, a written memorandum of the sale, signed by the parties, did not make an executed sale, but only a contract of sale, and a purchaser was not required to accept goods tendered which did not conform to the description therein.

3. **United States** ⊚⟿60—**Local board of sale control, created by War Department in connection with sale of surplus war material, held authorized to settle disputes arising out of sale contracts.**

Executive officers, appointed by the War Department under authority of acts of Congress providing for sale of surplus war material, including local boards of sale control established in each department created, *held* to have discretionary authority to settle disputes arising out of contracts of sale still unexecuted, and to make new contracts when deemed necessary.

At Law. Actions by the United States against Harry Koplin, against the La Grange Grocery Company, and against the West Point Grocery Company. On motions to strike out portions of each answer. Denied.

. C. P. Goree, Asst. U. S. Atty., of Atlanta, Ga., and O. R. McGuire, of Washington, D. C., for the United States.

Hoke Smith, F. M. Bird, and Marion Smith, all of Atlanta, Ga., and Hatton Lovejoy, of La Grange, Ga., for defendants West Point Grocery Co., and La Grange Grocery Co.

Slaton & Hopkins, Herbert J. Haas, and Louis Koplin, all of Atlanta, Ga., for defendant Koplin.

SIBLEY, District Judge. These are suits at law to recover balances alleged to be due for goods sold and delivered. Motions are made to strike certain portions of each answer. The answers are similar, and the questions involved may be dealt with in one opinion. The answers, as amended, are argumentative, more full of general conclusions than of definite facts, and do not disclose with clearness what it is contended really happened; but for present purposes the cases may be thus stated:

An auction sale was had in February and March, 1922, at Candler Warehouse, Atlanta, Ga., of vast amounts of surplus army supplies belonging to the United States, stored at Atlanta and other points in the Southeast, under the direction of Capt. Roy W. Hern, Surplus Property Control Officer for the Southeastern Area. The sale was advertised to be held under terms and conditions fully set forth in a printed catalogue of the goods to be sold. The presently material terms provided for an auction sale at Candler Warehouse of the listed property "as is, where is, without warranty or guaranty as to quality, character, condition, size, weight, or kind," and stated that no representative of the government is authorized to make any statement or representations as to those matters, and that the large lots would be subdivided, so as to give opportunity to smaller buyers. Inspection was invited by the bidders for one week before the sale, and was to be relied on in lieu of warranties. Samples, where practicable, were to be exhibited at the auction, but it was stipulated:

"While samples of the property are believed to be representative and will be exhibited at the time of sale, prospective buyers are urged to make an inspection of the property at its place of storage prior to the sale. This is specially enjoined, owing to the fact that the government will not entertain claims

of any nature whatsoever, should the property bought not come up to the standard of the sample or the expectations of the purchaser in any particular whatsoever."

Portions of large lots of shoes, hats, undershirts, brushes, and other articles were bid in by the several defendants, and separate written memoranda of each purchase were issued upon what is known as "Form SP No. 13," signed by Capt. Hern, and acknowledged by the signature of the purchaser. When the goods here involved were delivered. they were rejected as not being those sold. Thereupon, having been inspected by a representative of the United States, the matters were severally laid before the local board of sales control, which, in each case, found the goods not to be those sold, and canceled the memorandum of sale and issued another memorandum, redescribing the property and fixing a lower adjusted price, which was paid by the purchasers and presumably covered into the treasury of the United States.

The answers set up that prior to the sale such was the immense quantity of goods that it was impossible to inspect them, and that the defendants and others were, in effect, refused an inspection on the ground that the packages were mostly inaccessible and could not be suffered to be broken and the contents scattered around, so that in fact there was not a sale under the catalogue terms and conditions, but one by oral description and sample exhibited. The contention is that, if the action of the local board of sales control was not valid, the articles delivered did not in fact correspond to those sold, and that the purchasers are liable only for the fair value of those delivered and accepted, and have paid that. There are other contentions, but the present motion to strike presents but these questions: (1) Can the purchasers claim the sales to have been made otherwise than under the catalogue terms? (2) If not, could the goods tendered be rightly rejected? (3) Had the local board of sales control authority to adjust the dispute?

[1] 1. It is not pretended that Capt. Hern, who put out the catalogue and authorized the sale, was present at the auction. No authority in the auctioneer is specially pleaded. The sales memoranda, signed afterward by Capt. Hern and the purchasers, each recite that, "the property here awarded to you is sold in accordance with the terms and conditions set forth in the catalogue of the sale at which the property was sold at Atlanta, Ga." By most elementary rules respecting written contracts, unless this writing be im-

24 F.(2d)—53½

peached for fraud, accident, or mistake in its making, all the representations and negotiations that may have occurred at the auction go for naught. The written agreement merges them. In the face of the writing it cannot be contended that the sale was by sample, or by oral description or representation or warranty, because in that writing it is agreed otherwise. The catalogue terms, which by reference are incorporated, and the memorandum itself signed by the parties, contain the contract of sale. The impossibility of inspection and the consequent difficulty of intelligent bidding, except by sample or the representations at the auction, does not alter the result. The catalogue, which was the authority for the auction, expressly stated that there was no power in those conducting it to make representations or sales by sample. If bidders were not afforded a reasonable inspection of what they were invited to buy, their remedy was to refuse to bid until such inspection was had or other terms of sale authoritatively proposed.

[2] 2. But from the allegations of the answer it is clear that the lots severally bid off were small fractions of large masses catalogued, and not specific articles identified beforehand to seller and purchaser. They were typical sales by description of unascertained goods. The bidding and the memoranda afterwards signed did not make executed sales, but only executory contracts, to be fulfilled by ascertainment and delivery thereafter of the goods. Goods tendered, which on inspection did not correspond to the description of the contracts, might rightly be rejected. Warranties of various sorts were excluded by the catalogue terms of sale; but this is not a matter of warranty, but goes to the identification of the thing sold.

"When the subject-matter of a sale is not in existence or not ascertained at the time of the contract, an undertaking that it shall, when existing or ascertained, possess certain qualities, is not a mere warranty, but a condition, the performance of which is precedent to any obligation upon the vendee under the contract, because the existence of those qualities, being part of the description of the thing sold, becomes essential to its identity, and the vendee cannot be obliged to receive and pay for a thing different from that for which he contracted." Pope v. Allis, 115 U. S. 363, 6 S. Ct. 69, 29 L. Ed. 393.

The catalogue and the sales memorandum described several of these lots as being "new," and the answers show that they were not, and were rejected for that reason. Such a

failure to fulfill the description would be a valid ground of rejection.

[3] 3. But the goods are alleged to have been finally accepted and paid for under other contracts made through the local board of sales control. What authority had it in the premises? All authority to dispose of surplus war supplies is derived from the Acts of May 10, 1918 (40 Stat. 548), and July 9, 1918 (40 Stat. 845), providing that the President, through the heads of departments, is authorized "in his discretion, and upon such terms as he shall deem expedient" to sell any supplies, etc., purchased for use in prosecuting the war. More specifically the Act of July 11, 1919 (5 USCA § 211), provided: "The Secretary of War be, and he is hereby, authorized to sell any surplus supplies * * * upon such terms as may be deemed best." This authority, like many others whose exercise requires much detail, was necessarily to be exercised through agents.

Accordingly, by order of February 27, 1919, under the first acts, the Secretary of War created the office of Director of Sales, making it the Director's duty "to promulgate, supervise, co-ordinate, and direct the selling of surplus supplies," etc.; the very words implying further agencies in the selling. March 17, 1919, the Secretary of War ordered: "There shall be organized in each of the supply bureaus and departments a local board of sales control, for the purpose of examining sales made within that bureau or department, and to see that such sales are handled in accordance with the principles and methods established by the Director of Sales, and that proper prices are received for the articles sold." May 25, 1920, the Director of Sales, referring to a communication from the Adjutant General, ordered: "In connection with contracts involving the sale of surplus government property, you are advised that every effort should be made in your own bureau to settle, in so far as the law permits, any claims or disputes which may arise, including those involving refundment where funds have not been covered into the treasury."

By an order of June 26, 1920, from the Quartermaster's Department, six surplus property areas were established, one embracing the Southeastern supply zone in charge of an officer at Atlanta, who was, as I understand it, Capt. Roy W. Hern; he having to aid him a local board of sales control. No other or further delegation of authority is set forth in the pleadings. Presumably the catalogue terms and conditions of sale were put forth by the Director of Sales through Capt. Hern. Capt. Hern's authority to promulgate them and make sales under them is not controverted. These would appear to be among "the principles and methods established by the Director of Sales," which the local board of sales control were to see were observed in the sales. But prices were not fixed by the catalogue, nor yet by the bidding, for no contract resulted until Capt. Hern accepted a bid referred to him and made a writing as required by law. Whether Capt. Hern took the advice of the local board before confirming sales does not appear. Perhaps the local board was called upon only in case of doubt or dispute. Anyhow, it is made its express duty to see that "proper prices" are received for the articles sold, and this authority and duty comes direct from the Secretary of War, in whom the whole power of sale was vested.

Proper prices, of course, means a fair value from the Government's standpoint. It equally may mean a fair value from the buyer's standpoint; that is to say, a just price in all respects. The Director of Sales, in the order of May 25, 1920, seems to have construed the powers of the local board in supervising sales and reviewing prices, to extend to the settling of disputes including the refunding of money when not yet paid into the treasury, "in so far as the law permits." I think, from these orders and the practice under them, never repudiated by the Secretary of War, that all the power which the Secretary of War, or the Director of Sales, had in reference to settling such disputes may be considered as passed on to Capt. Hern and his local board.

The vital question really is: To what extent does the law permit such settlements to the War Department? Had the law vested the power exclusively elsewhere? The refunding of money that is already covered into the Treasury is recognized as beyond reach. The Act of May 10, 1918, regarding sales such as this, expressly requires the proceeds to be paid into the Treasury. The Act of July 9, 1918, requires them to be credited to the particular appropriation from which the goods sold were bought. The Act of July 11, 1919 (5 USCA § 211), is silent as to the disposition of proceeds, but 31 U. S. Code, 484, 487, require all moneys received for the United States, including the proceeds of sales (with a few exceptions), to be paid into the Treasury. But all these provisions apply only to a final collection. Money received for the United States by evident mistake, or on an unfulfilled condition,

for instance, could be promptly returned. To really become proceeds of a sale, there must have been a completed sale.

Refunds of money, however, are not here involved, but settlements of another sort. As to such the general power of compromise of claims in favor of the United States is, by 31 U. S. Code, 194, put in the Secretary of the Treasury. Nevertheless, executive officers have some power of control over business which they are actually conducting for the United States. Thus an adjustment of a current transaction by such an officer was upheld in United States v. Corliss Co., 91 U. S. 321, 23 L. Ed. 397. In another case, where no statutory authority for any action could be found, the settling by an agent of the Interior Department of a claim respecting timber cut from the public lands was sustained. Wells v. Nickles, 104 U. S. 445, 26 L. Ed. 825. In Maryland Steel Co. v. United States, 235 U. S. 451, 35 S. Ct. 190, 59 L. Ed. 312, the waiver of a time limit with damages stipulated for in a contract was upheld against the objection of a want of authority in the quartermaster, the court saying (page 459 [35 S. Ct. 192]): "The case at bar is a case of contract authorized by law, necessarily entered into and conducted by the officers of the government, and as necessarily they must have had the powers to make it effective in its beginning and progress." In United States v. Mason, 260. U. S. 323, 43 S. Ct. 128, 67 L. Ed. 286, the officer put into a building contract a provision which reserved in himself the power of adjustment of disputes. The power and his exercise of it were upheld.

The provision of 31 U. S. Code, 71, that all claims for or against the United States shall be settled and adjusted in the General Accounting Office, has as its special purpose the full auditing of them for payment and the inquiry for counterclaims and the like, rather than a compromise of disputes on the one hand, or an adjudication of them on the other. I think the true line of the executive officer's power of adjustment in matters which he is conducting must be drawn at what is really necessary to enable him to carry to a conclusion the act which he has authority to perform. If his only authority is to conclude a contract, he cannot, after making it, revise it or make another. If he has authority also to supervise its execution, he has a measure of discretion as to how exact an execution he will require. The question is really one of a fair estimate of the power intended to be intrusted to him.

Now in the present case the Secretary of War, through the officers to whom he had delegated the power, was authorized to *sell* the surplus property. This power was not executed by merely making *contracts of sale,* but extended to the full execution of the sale by delivering the property and collecting the price. If, after a contract for the sale of articles was made, the contract could not be carried out because of reasonable dispute as to its existence or terms, the congressional intent must have been that an adjustment or a new contract should be made; otherwise, it could not be said that a sale had been effected, and certainly the proceeds could not be covered into the Treasury. The acts do not require an auction sale, but allow one of any sort, in the discretion of the Secretary of War. Therefore the fact that the adjustment may amount to a new contract, or even take that form, as it did in this case, is not unlawful. If the agents of the Secretary determined that, because of mistake, inability, or failure to deliver goods as described, or other just reason, an attempted sale has failed, another one on other terms was appropriate. It was altogether desirable and necessary that such matters be settled at once and by the persons having knowledge of them, so that the property might be sold to others, if need be. These things are fairly included in the authority to sell the property. The actions of the local board set up in the answers should be upheld, if proved. Levy v. United States, Court of Claims, decided February 14, 1927.

Orders upon the several answers may be taken in accordance with this opinion.