## UNITED STATES v. WEST POINT GROCERY CO.

District Court, N. D. Georgia. Atlanta Division. March 5, 1929.

No. 933.

Clint W. Hager, U. S. Atty., and C. P. Goree, Asst. U. S. Atty., both of Atlanta, Ga.

Hatton Lovejoy, of LaGrange, Ga., and Hoke Smith, Marion Smith, and F. M. Bird, all of Atlanta, Ga., for defendant.

SIBLEY, District Judge. The law questions upon the pleadings were ruled in United States v. West Point Grocery Co. (D. C.) 24 F.(2d) 840. Thereafter the United States withdrew its claims for recovery, and the suit is pending only on paragraph 9 and following of the petition as answered, and the counterclaim made by the defendant upon the sale therein set forth. The case has been heard by the court without a jury. The evidence shows that a sale by the United States was had at Camp Jackson on June 8, 1922, of surplus property there stored under terms set forth in a published catalogue similar to that discussed in the cited decision. One item therein, No. 166, was thus set forth: "#6978 C. E. Hats, Service, each, 9747." The number 6978 C. E. was supposed to be a number assigned and attached to the lot of supplies when condemned for sale and put in the warehouse. This same number appears for numerous other items in this catalogue. It would thus tend to describe a particular lot of goods to be sold. Capt. Hearn, who was the officer directly in charge of the sale, testifies, however, that he does not know whether the particular hats so described were in the warehouse at the time of the sale or not, or whether such number was on any lot therein. Mr. Hegerdorn, the vice president of the grocery company, sought to inspect this item previous to the sale, and found no such number on the goods, but saw 6,000 or 7,000 new and unused hats in the warehouse, and no used or secondhand ones. When the item was offered at auction, Capt. Hearn and his superior officer, the Director of Sales from Washington, Maj. Edgerton, were present. Mr. Hegerdorn publicly asked if the hats offered were unused or secondhand, the catalogue being silent. Maj. Edgerton publicly replied, unused, like the sample shown by the auctioneer. The item was knocked down at 44 cents each. The same day a written acceptance of the bid, on Form S. C. No. 13, was made and signed by Capt. Hearn, for

the United States, in which the hats were expressly described as unused. Payment of the bid was charged against a letter of credit furnished by the grocery company, and a lot of 7,623 hats was tendered, about July 12th, for delivery, which, being all secondhand, or worse, were rejected as not being those bought. The matter went to the local board of sales control, who, after an inspection of the hats, proposed an adjustment by the grocery company taking the hats at 12 cents each. This was acceded to by the grocery company. Most of the hats had finally to be sold by it as wool junk. Twelve cents was a fair average market value for the lot. About August 1st, the local board, without notice to or participation by the grocery company, rescinded its former action, reciting certain newly ascertained facts as justifying it in so doing. The General Accounting Office of the Government likewise, in adjusting the account, held the grocery company to be bound by its bid of 44 cents. The evidence showed an organization of and authority in the local board such as is set forth in United States v. West Point Grocery Co. (D. C.) 24 F.(2d) 840, supra. There is no testimony that the hats delivered were lot No. 6798 C. E., as catalogued.

On these facts I think the grocery company is clearly not bound for a price of 44 cents each for the hats delivered and accepted by it. It is probable that Maj. Edgerton had authority to modify the catalogue description at the sale, as he appears to be the officer who made the catalogue originally; but independently of that, the written contract of sale required by law was that embodied in Form S. P. 13, in which the hats sold and to be delivered were described as service hats, *unused*. According to the certified copy from the War Department, this was signed both by Capt. Hearn, for the United States, and by West Point Grocery Company, per J. J. H. The description in the catalogue, though referred to in this contract, did not conflict with the description as unused, being merely silent on that point. In the sale of such things as wearing apparel, such an element of description cannot be considered unimportant, especially when direct inquiry was publicly made at the auction upon which the sales contract was based. If this was a sale of a specific lot of goods, identified by a number, there is no proof that that lot was ever delivered, or that the hats tendered were even a part of it. The fairer conclusion is that the special lot, if in the warehouse and offered for sale, was the lot of new hats seen by Mr. Hegerdorn, and from which the samples were apparently taken. If not, there was such a mutual mistake of fact as to identity as ought fairly to set aside the sale. If there was not a sale of a specific lot of hats, then the description "unused" in the contract ought to be fulfilled by the articles delivered, as heretofore ruled. In either case there was fair occasion for dispute, and it was within the province of the local board to adjust it. Their proposal of 12 cents was accepted and acted upon and made a complete, executed settlement. The local board's later action was without legal effect on the settlement. If the facts it recited as ground for disavowing it were proven to be true, there might be ground in court to impeach the contract of settlement, but they have not been proven. The recital of them ex parte is mere hearsay, and was so held on this trial. But independently of that settlement, the evidence shows that the grocery company was not bound to accept the hats tendered under the sales contract, and did not do so. If not taken under the board's authority in the settlement, the company would still be liable only for the fair market value of the hats, which is, on an average, 12 cents. The grocery company is therefore entitled to recover the difference between this value and the amount paid, 32 cents, on each of the 7,623 hats, to wit $2,439.36.

Judgment may be taken accordingly.