**BROWN v. BERNSTEIN et al.**
**Civ. No. 1161.**

District Court, M. D. Pennsylvania.
April 13, 1943.

See, also, 49 F.Supp. 497.

Russell J. O'Malley and Paul F. Gibbons, both of Scranton, Pa., for plaintiff.

J. Julius Levy and Irving L. Epstein, both of Scranton, Pa., for defendant.

JOHNSON, District Judge.

Prentiss M. Brown, Administrator, Office of Price Administration, has filed in this court his complaint against the above-named defendant, alleging violation of a governmental meat restriction order and praying that the defendant be enjoined and restrained from further violation thereof.

The defendant before answering the complaint, presented a motion: "To dismiss the action because the jurisdiction of this Court is invoked solely on the ground that 'the jurisdiction is conferred upon the Court by Section 2(a)6 of the Act of June 28, 1940', as amended, whereas, said Act as amended, does not confer such jurisdiction upon this Court over the subject-matter set forth in the Bill."

In paragraph one of the complaint it is alleged that: "1. The jurisdiction of this action is conferred upon the Court by Section 2a(6) of the Act of June 28th, 1940 entitled 'An Act to. expedite the National Defense and for other purposes' (Public Law 671, 76th Cong. 3rd Sess. 54 Stat. 676) as amended by Public Law 89, 77th Cong. 1st Sess., Ch. 157, 55 Stat. 236, and as further amended by Public Law 507, 77th Cong. 2nd Sess., Ch. 199, 56th Stat., hereinafter called 'The Act'."

Defendant by his counsel in oral argument and briefs filed, takes the position that although subsection six of the Act of June 28, 1940, as amended, confers jurisdiction on this court, the subject matter of the act as amended does not relate to the subject matter of the bill. The complaint alleges a violation of Supplementary Directive 1-M pertaining to the rationing of meat. It is the main contention of defendant that the Act of June 28, 1940, pertains solely to Army, Navy, and Coast Guard contracts for the acquisition, construction, repair, or alteration of complete naval vessels or aircraft. Defendant contends that the Administrator is in error in

attempting to ration meat under the provision of this enactment.

For the purpose of the discussion and decision of the question raised by the defendant's motion a review of the various steps which have led to rationing control is necessary.

On September 8, 1939 the President of the United States issued a Declaration that a State of National Emergency existed.

On June 28, 1940 Congress passed an act "To expedite national defense, and for other purposes", Public No. 671, 76th Cong. 3d Sess., 54 Stat. 676, providing in Sec. 2(a), 41 U.S.C.A. preceding section 1 note, for the Secretary of the Navy to negotiate contracts for the acquisition, construction, repair, or alteration of complete naval vessels or aircraft, and also for machine tools and other similar equipment, with or without advertising or competitive bidding upon determination that the price is fair and reasonable, and "deliveries of material under all orders placed pursuant to the authority of this section *and all other naval contracts or orders and all Army contracts and orders* shall, in the discretion of the President, take priority over all deliveries for private account or for export". (Italics supplied.)

On January 7, 1941, by Executive Order 8629, C.F.R.1941 Supp. page 130, there was established in the Executive Office of the President the Office of Production Management to "Formulate and execute in the public interest all measures needful and appropriate in order (1) to increase, accelerate, and regulate the *production* and *supply* of *materials,* articles and equipment and the provision of emergency plant facilities and services *required for the national defense,* and (2) to insure effective coordination of those activities of the several departments, corporations, and other agencies of the Government which are directly concerned therewith". (Italics supplied.)

On April 11, 1941, in Executive Order 8734, C.F.R.1941 Supp. page 199, the President declared "By virtue of the authority vested in me by the Constitution and the statutes, * * * for the purpose of avoiding profiteering and unwarranted price rises, and of facilitating an adequate supply and the equitable distribution of materials and commodities for civilian use, and finding that the stabilization of prices is in the interest of national defense and that this Order is necessary to increase

the efficiency of the defense program, it is hereby ordered:

"1. There shall be in the Office for Emergency Management of the Executive Office of the President an Office of Price Administration and Civilian Supply, at the head of which shall be an Administrator appointed by the President. * * *"

On May 27, 1941, the President issued a Declaration that a state of Unlimited National Emergency existed.

On May 31, 1941, Congress amended the Act of June 28, 1940, supra. This amending act, Public Law 89 of the 77th Congress, 55 Stat. 236, is entitled "An Act to amend the Act approved June 28, 1940, entitled 'An Act to expedite the national defense, and for other purposes', in order to extend the power to establish priorities and allocate material". This amendment added to Sec. 2(a) of the original Act, 41 U.S.C.A. preceding section 1 note, the following:

"(2) Deliveries of material to which priority may be assigned pursuant to paragraph (1) shall include, *in addition* to deliveries of material under contracts or orders of the Army or Navy, deliveries of material under—

     *     *     *     *     *

"(B) Contracts or orders which the President shall deem necessary or appropriate to promote the defense of the United States; * * *."

This amendment further provides, "Whenever the President is satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of *any material* for defense or for private account or for export, the President may allocate such material in such manner and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense". (Italics supplied.)

On August 28, 1941, by Executive Order 8875, C.F.R.1941 Supp. page 270, under the title "Delegation and Coordination of Priority Authority", the Office of Production Management was given additional responsibilities of priority action under the Supply Priorities and Allocations Board created by the same order, with respect to the procurement, production, transmission, or transportation of materials, articles, power, fuel and other commodities among the various phases of the defense program and competing civilian demands. The Office of Price Administration and Civilian Supply

was in this order changed to the Office of Price Administration.

On January 16, 1942, by Executive Order 9024, 7 F.R. 329, the War Production Board was established. The Administrator of the Office of Price Administration was made a member of the Board. The purpose of the Board was to:

"a. Exercise general direction over the war procurement and production program.

"b. Determine the policies, plans, procedures, and methods of the several Federal departments, establishments, and agencies in respect to war procurement and production, * * *.

"c. Perform the functions and exercise the powers vested in the Supply Priorities and Allocations Board by Executive Order No. 8875 of August 28, 1941. [Supra]

"d. Supervise the Office of Production Management in the performance of its responsibilities and duties, and direct such changes in its organization as he may deem necessary.

"e. Report from time to time to the President on the progress of war procurement and production; and perform such other duties as the President may direct."

On January 24, 1942, by Executive Order 9040, 7 F.R. 527, the War Production Board was directed to perform the functions and exercise the powers theretofore vested in the Office of Production Management which was thereby abolished, and, "3. The Chairman of the War Production Board may exercise the powers, authority, and discretion conferred upon him by this or any other Order through such officials or agencies and in such manner as he may determine; and his decisions shall be final."

It is to be noted that all of the above recited Executive Orders provide for the appointment of an agency within the Executive Office of the President and contain the statement that they are issued by the President "By virtue of the authority vested in me by the Constitution and the statutes of the United States, * * *."

On January 24, 1942, by Directive No. 1, 7 F.R. 562, Donald M. Nelson, Chairman of the War Production Board, pursuant to the authority vested in him by the two immediately preceding Executive Orders (Nos. 9024 and 9040), delegated to the Office of Price Administration "authority to provide for the equitable rationing of products at the retail level". In issuing this Directive, Donald M. Nelson, Chairman of the War Production Board, recites the delegation of authority to the Office of Price Administration with respect to rationing as follows: "(a) The Office of Price Administration is authorized and directed to perform the functions and exercise the power, authority and discretion conferred upon the President by section 2(a) of the Act of June 28, 1940 (Pub. No. 671, 76th Cong., 54 Stat. 676) as amended by the Act of May 31, 1941 (Pub. No. 89, 77th Cong., 55 Stat. 236) with respect to the exercise of rationing control over (1) the sale, transfer or other disposition of products by any person who sells at retail to any person, and (2) the sale, transfer or other disposition of products by any person to an ultimate consumer. The term 'ultimate consumer,' as used by this Directive, means a person acquiring products for the satisfaction of personal needs as distinguished from one acquiring products for industrial or other business purposes".

On January 30, 1942, Congress enacted the Emergency Price Control Act of 1942, Pub.Law 421, 77th Cong., 50 U.S.C.A. Appendix § 901 et seq., entitled "An Act to further the national defense and security by checking speculative and excessive price rises, price dislocations, and inflationary tendencies, and for other purposes". By this Act the Office of Price Administration, created initially by Executive Order 8734, April 11, 1941, became a statutory agency.

On March 27, 1942, Congress enacted the Second War Powers Act, 1942, 56 Stat. 176, entitled "An Act to further expedite the prosecution of the war". It is to be noted in connection with this Second War Powers Act that it is an Omnibus Bill comprising fifteen titles:

Title 1– Emergency Powers of the Interstate Commerce Commission Over Motor And Water Carriers

Title 2– Acquisition And Disposition of Property·

Title 3– Priorities Powers

Title 4– Purchase By Federal Reserve Banks of Government Obligations

Title 5– Waiver Of Navigation And Inspection Laws

and so on for fifteen titles, each comprising a separate enactment affecting unrelated matters.

Title 3 entitled "Priorities Powers", with which we are here concerned, is a re-

enactment of Sec. 2(a) of the Act of June 28, 1940, entitled "'An Act to expedite national defense, and for other purposes,' as amended," etc. By the re-enactment the phrase "any facilities for defense or for private account or for export", was included for the purpose of permitting the greatest possible expedition of the conversion of civilian plants to war uses. The significant portion of this Second War Powers Act is the following:

"(2) Deliveries of material to which priority may be assigned pursuant to paragraph (1) shall include, in addition to deliveries of material under contracts or orders of the Army or Navy, deliveries of material under—

\* \* \* \* \*

"(B) Contracts or orders which the President shall deem necessary or appropriate to promote the defense of the United States." 41 U.S.C.A. preceding section 1 note.

As above stated this is an Omnibus Bill. The practice governing the enactment of legislation in the Federal Congress differs materially from Pennsylvania practice. It is and has been the practice of the Federal Congress to provide appropriations for various purposes by such means, to cover unrelated topics in one bill by such means and to re-enact legislation changing both the title of the bill and the express purpose for which the act is created.

On September 12, 1942, by Supplementary Directive 1-M (7 F.R. 7234) the authority delegated to the Office of Price Administration by Directive No. 1 was extended to include the exercise of control over the sale, transfer, delivery or other disposition of meat.

On October 2, 1942, United States Code Congressional Service No. 9, page 1202, Pub.Law 729, 77th Cong. 50 U.S.C.A. Appendix § 961 et seq., the Price and Wage Control Act was passed entitled "An Act to amend the Emergency Price Control Act of 1942, to aid in preventing inflation, and for other purposes."

This is the history by Executive Order, Legislative Enactment, and Directive, of Rationing Control.

In examining this chain of authority attention is called to the fact that when Donald M. Nelson on January 24, 1942 issued Directive No. 1 he gave as the authority for the Directive the Act of June 28, 1940, as amended, supra, and omitted reference to other authorities which the Office of Price Administration possessed.

It clearly appears from the history of this rationing movement that in addition to the Act of June 28, 1940, and its amendments, there existed for the purpose of avoiding profiteering, unwarranted price rises, and to facilitate production of an adequate supply and an equitable distribution of materials and commodities for defense and civilian supply, the very broad phraseology of the foregoing Orders and Directives which alone are sufficient, through a period encompassing both National Emergency and a State of War, to accomplish the purpose of the National Government in exercising the necessary control.

■ This court takes judicial notice that a state of war exists. Stephens v. United States, 9 Cir., 261 F. 590; Hamm v. United States, 9 Cir., 261 F. 907; Bouldin v. United States, 5 Cir., 261 F. 674; Weisman v. United States, 7 Cir., 271 F. 944. We are at war with the most dangerous military powers on earth. The safety and welfare of our citizens and the success of our armed forces at home and abroad depend upon the proper control of our resources.

■ To carry out the meaning and intent of Congress in adopting a statute, and to understand what that intent was, it is proper for the court to ascertain the mischief supposed to prevail at that time and which it was sought to remedy. United States v. Lewis, D.C.Mo.1911, 192 F. 633.

■ In the broad viewpoint which must necessarily be taken in the interpretation of emergency and war time legislation for the protection of our nation the Act of June 28, 1940 is not limited to Army and Navy contracts. For instance Title 2 of the Act of June 28, 1940, in addition to the matters above noted, deals with the creation of the United States Housing Authority. The Authority is not limited to the supply of housing for the Army and Navy alone but may supply housing when an acute shortage exists in any locality providing defense facilities.

The pertinent congressional legislation has served not to narrow or limit this chain of Executive Orders but to broaden and enhance the powers therein given.

It is to be noted with emphasis that the matter of a national emergency is, and always has been, left to the judgment of the President. This has been expressly and

732

repeatedly confirmed in many statutes giving the President varied powers whenever in his judgment a National Emergency exists. The following examples will illustrate this fact:

Act of July 1, 1918, 40 Stat. 717, 14 U.S.C.A. §§ 164, 165, 34 U.S.C.A. § 423, relating to the Coast Guard.

Act of October 6, 1917, 40 Stat. 415, as amended, 50 U.S.C.A.Appendix § 5, relating to currency.

Act of February 4, 1887, 24 Stat. 380, as amended, 10 U.S.C.A. § 1362, relating to preference to shipments of troops and material of war.

Act of January 28, 1915, 38 Stat. 800, 14 U.S.C.A. § 1, relating to the Coast Guard and the Navy.

In these statutes and in the order in which they are listed the following phrases are used synonymously, "During the existence of war or of a national emergency"; "During time of war or during any other period of national emergency"; "In time of war or threatened war"; "In time of war or when the President shall so direct".

The various Acts of Congress authorizing the President to take action in the event of a National Emergency show that congress throughout the years made little or no distinction between a State of National Emergency and a State of War.

Justice Story on February 2, 1827, in the case of Martin v. Mott, reported in 12 Wheat. 19, 27, 6 L.Ed. 537, expressed the opinion of the Supreme Court of the United States in a matter concerning emergency powers of the President. In that case defendant had filed a demurrer to an avowry which demurrer alleged that a fine and forfeiture imposed by a court martial for failure to enter the services of the United States as a militiaman when thereto required by the President of the United States, was in error, because the necessary authority therefore was lacking. In the opinion Justice Story stated,

"The constitution declares, that congress shall have power 'to provide for calling forth the militia, to execute the laws of the Union, suppress insurrections, and repel invasions;' * * * In pursuance of this authority, the act of 1795 has provided, 'that whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the president of the United States to call forth such number of the militia of the state or states most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion, and to issue his order for that purpose to such officer or officers of the militia as he shall think proper.' * * *

"The power thus confided by congress to the president, is, doubtless, of a very high and delicate nature. A free people are naturally jealous of the exercise of military power; and the power to call the militia into actual service, is certainly felt to be one of no ordinary magnitude. But it is not a power which can be executed without a correspondent responsibility. It is, in its terms, a limited power, confined to cases of actual invasion, or of imminent danger of invasion. If it be a limited power, the question arises, by whom is the exigency to be judged of and decided? Is the president the sole and exclusive judge whether the exigency has arisen, or is it to be considered as an open question, upon which every officer to whom the orders of the president are addressed, may decide for himself, and equally open to be contested by every militiaman who shall refuse to obey the orders of the president? We are all of opinion, that the authority to decide whether the exigency has arisen, belongs exclusively to the president, and that his decision is conclusive upon all other persons. We think that this construction necessarily results from the nature of the power itself, and from the manifest object contemplated by the act of congress. The power itself is to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union. A prompt and unhesitating obedience to orders is indispensable to the complete attainment of the object. * * *

"The power itself is confided to the executive of the Union, to him who is, by the constitution, 'the commander-in-chief of the militia, when called into the actual service of the United States,' whose duty it is to 'take care that the laws be faithfully executed,' and whose responsibility for an honest discharge of his official obligations is secured by the highest sanctions. He is necessarily constituted the judge of the existence of the exigency, in the first instance, and is bound to act according to his belief of the facts. * * * Whenever a statute gives a discretionary power to any person, to be exercised by him, upon his own opinion of certain facts, it is a

sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts. * * * It is no answer, that such a power may be abused, for there is no power which is not susceptible of abuse. The remedy for this, as well as for all other official misconduct, if it should occur, is to be found in the constitution itself. In a free government, the danger must be remote, since, in addition to the high qualities which the executive must be presumed to possess, of public virtue, and honest devotion to the public interests, the frequency of elections, and the watchfulness of the representatives of the nation, carry with them all the checks which can be useful to guard against usurpation or wanton tyranny."

In the case of In re Neagle, 135 U.S. 1, at page 63, 10 S.Ct. 658, at page 668, 34 L.Ed. 55, decided on April 14, 1890, it is stated,

"The constitution, § 3, Art. 2, declares that the president 'shall take care that the laws be faithfully executed;' and he is provided with the means of fulfilling this obligation by his authority to commission all the officers of the United States, and, by and with the advice and consent of the senate, to appoint the most important of them, and to fill vacancies. He is declared to be commander in chief of the army and navy of the United States. The duties which are thus imposed upon him he is further enabled to perform by the recognition in the Constitution, and the creation by acts of congress, of executive departments, which have varied in number from four or five to seven or eight, who are familiarly called 'cabinet ministers.' These aid him in the performance of the great duties of his office, and represent him in a thousand acts to which it can hardly be supposed his personal attention is called, and thus he is enabled to fulfill the duty of his great department, expressed in the phrase that 'he shall take care that the laws be faithfully executed.'

"Is this duty limited to the enforcement of acts of congress or of treaties of the United States according to their express terms; or does it include the rights, duties, and obligations growing out of the constitution itself, our international relations, and all the protection implied by the nature of the government under the constitution?"

█ Executive Orders issued and legislation enacted during a national emergency and in time of war must be expressed in broad terms and generalities. In the interpretation of such legislation the court must not hunt for limitations nor scutinize the wording with confining intent but should seek for the purpose and spirit of the enactment.

█ The Executive Orders, Legislative Enactments, and Directives, cited above, are intended to be, and are, a protection to this nation under the powers of the Constitution and there has resulted therefrom a duly established right in the Administrator of the Office of Price Administration to engage in such activities as are presented in the complaint which is now before us.

And now, therefore, this 13th day of April, 1943, the motion of the defendant to dismiss the complaint is hereby denied and the defendant is given an additional 15 days to answer on the merits.