**PERKINS v. BROWN, Adm'r of Office of Price Administration, et al.**

No. 265.

District Court, S. D. Georgia, Savannah Division.

Nov. 15, 1943.

Aaron Kravitch, of Savannah, Ga., for plaintiff.

Perry Brannen, of Savannah, Ga., and S. F. Memory, Jr., of Blackshear, Ga., for defendants.

LOVETT, District Judge.

Plaintiff, a retail gasoline dealer, having been ordered by the Office of Price Administration to suspend selling or dealing in gasoline for three months, has brought this suit to restrain enforcement of the order. He challenges the action of the OPA on the grounds, first, that it is arbitrary and capricious and without substantial evidence to support it, secondly, that the delegation by the President to the Office of Price Administration of the authority, power and discretion conferred upon him by certain Acts of Congress, which will be presently discussed, was invalid, third, that there is no statutory warrant for the granting of suspension orders by the Office of Price Administration for violations of the regulations and, fourth, that the Suspension Order and procedure prescribed by the OPA for its issuance are violative of Secs. 1 and 2 of Art. III of the Constitution, for that the action taken is punitive and involves a judicial function vested by the Constitution exclusively in the courts, and was not by Congress—and indeed could not be—delegated to the ex-

ecutive department or any or its administrative agencies.

The issues and facts are stipulated.

After due notice and a hearing before a "Hearing Commissioner" it was found by the agency that plaintiff had violated certain ration orders promulgated by it prescribing, in substance, that every dealer shall at all times have in his possession or control gasoline coupons having an aggregate gallonage value which, when added to the gasoline on hand, equals and does not exceed his storage capacity; and that the dealer may deliver gasoline to the consumer only in exchange for coupons bearing certain notations and endorsements and which at the time are valid. Ration Order 5C Secs. 1394.8217, 1394.8153, 1394.8152, 1394.7652. The suspension order was made under Sec. 1394.8302. See 7 F.R. 9135 et seq., 9787. A hearing was held under procedural regulation 4, Sec. 1300.151, et seq., 7 F.R. 4296 et seq. On appeal by the plaintiff to the "Hearing Administrator", set up by the regulations, the suspension order was affirmed. This has exhausted his administrative remedies,[1] sometimes referred to as a "rule of judicial administration". Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50, 51, 58 S.Ct. 459, 463, 82 L.Ed. 638.

■ The urge that the action of the hearing commissioner was without substantial evidence to justify his order and, therefore, was arbitrary, capricious and unreasonable may be quickly disposed of. The short answer is that plaintiff admitted on the hearing the violations charged against him. The only defense he then asserted was that his disregard of the ration orders was unintentional. There was sufficient evidence to make that claim issuable, and it is not within the province of this court to review the findings of the agency on such issues of facts. United States v. George S. Bush & Co., 310 U.S. 371, 380, 60 S.Ct. 944, 84 L.Ed. 1259; Railroad Commission v. Rowan & Nichols Oil Co., 310 U.S. 573, 580, 581, 60 S.Ct. 1021, 84 L.Ed. 1368; Houston v. St. Louis Independent Packing Co., 249 U.S. 479, 484, 39 S.Ct. 332, 63 L.Ed. 717; Farley v. Heininger, 70 App.D.C. 200, 105 F.2d 79, 81, 82, certiorari denied 308 U.S. 587, 60 S.Ct. 110, 84 L.Ed. 491.

■ The authority of the OPA to adopt the regulations in question and to issue suspension orders for violations stems from Secs. 2(a) (2) and 2(a) (8) of "an Act to expedite national defense, and for other purposes". Act of June 28, 1940, 54 Stat. 676, 41 U.S.C.A. note preceding Section 1, as amended by the Act of May 31, 1941, 55 Stat. 236, and by Title III of the "Second War Powers Act of 1942", 56 Stat. 176, 50 U.S.C.A.Appendix, § 631 et seq., § 633.

By the last mentioned Act: "Whenever the President is satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of any material or of any facilities for defense or for private account or for export, the President may allocate such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense". Sec. 2(a) (2), Title III.

The Act further provides: "The President may exercise any power, authority, or discretion conferred on him by this subsection (a), through such department, agency, or officer of the Government as he may direct and in conformity with any rules and regulations which he may prescribe". Sec. 2(a) (8).

By successive executive orders and directives the President has lodged in the Office of Price Administration, so far as material here, the power granted to him to allocate vital materials necessary in the war effort, such as gasoline, upon the conditions and to the extent deemed necessary.

With the power in the President to allocate such materials conceded—as plaintiff here concedes—in the light of express authority conferred upon him by Congress to delegate such power to any agency of government as he may direct, I am unable to see how there has been any unlawful delegation.

No one will deny that gasoline is vital to the successful prosecution of the war. If the supply and distribution are uncontrolled scarcity inevitably will result. Scarcity follows without control because of the ability and willingness of some groups to buy more than they need under a war time economy and their disposition

---

[1] What is here said applies to one of plaintiff's gasoline stations only. He had an interest in two. No final order of suspension has been entered as to the second station, and I shall, therefore, treat this case as though he had only one station.

to buy for future as well as for present use. The effects of uncontrolled scarcity would be serious indeed. In modern war, armed forces move only as fuel for transporting them is available. Indirectly, scarcity without control contributes to the inflationary spiral which price regulation, primarily at least, is designed to control. Accordingly, allocation, or rationing as it is more commonly called, has for its purpose the use of vital war materials in the manner most helpful to the war effort, the equitable distribution when scarcity exists in order that our complicated economy may be least dislocated and disturbed, and finally the prevention of inflation. Incidently, it results in reducing consumption to the end that man-power, plant capacity and raw materials may be the greater devoted to war production.

■ If, then, rationing is essential to the proper prosecution of the war effort, there can be no doubt of the power of Congress to enact the legislation here involved as an appropriate means to a permitted end under Art. 1, Sec. 8 of the Constitution, usually referred to as the war powers of Congress; and that the citizen may suffer some inconvenience or pecuniary loss constitutes no violation of the Due Process Clause of the Constitution. Amend. 5. It was for Congress to make the choice of the means by which its objective of winning the war was best to be secured. Virginian R. Co. v. System Federation, 300 U.S. 515, 553, 554, 57 S.Ct. 592, 81 L.Ed. 789; Hamilton v. Kentucky Distilleries Warehouse Co., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194; Ruppert v. Caffey, 251 U.S. 264, 302, 40 S.Ct. 141, 64 L.Ed. 260.

There is no unconstitutional delegation of legislative power. Congress expressly authorized sub-delegation by the President. Opp Cotton Mills v. Administrator, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; Taylor v. Brown, Em. App., 137 F.2d 654; Brown v. Bernstein, D.C., 49 F.Supp. 728; Henderson v. Smith-Douglass Co., D.C., 44 F.Supp. 681; Henderson v. Bryan, D.C., 46 F.Supp. 682, 683 (10), 687; United States v. Randall, D.C., 50 F.Supp. 139. Apart from statutory authority for delegation to another by the named delegate such right may be implied because of the very necessities of the case.

Williams v. United States, 42 U.S. 290, 1 How. 290, 11 L.Ed. 135; May v. United States, 8 Cir., 236 F. 495; United States v. Barono, D.C., 50 F.Supp. 520.

■ Whether a suspension order such as here involved is authorized by Section 2(a)(2) of the Act should be approached with recognition that legislation enacted during a national emergency and in time of war must be expressed in broad terms and generalities. As stated in Brown v. Bernstein, supra [49 F.Supp. 733], in "the interpretation of such legislation the court must not hunt for limitations nor scrutinize the wording with a confining intent but should seek for the purpose and spirit of the enactment".

■ Under the Act the President, through his delegate, is authorized to allocate shortage materials "in such manner upon such conditions and to such extent" as he shall deem necessary or appropriate in the public interest and to promote the national defense. It seems clear to me that a suspension order such as here involved is authorized by that section of the Act. If the rationing regulations had provided generally that vital materials such as gasoline should be distributed only by named employees of the government or that only those dealers who in the past had observed the rationing regulations were eligible for allocation of rationed commodities, there could be little doubt that such provision would be an exercise of the statutory power to allocate and to prescribe the conditions for allocation. Precisely the same effect is produced by a ration system which permits the receipt and transfer of commodities by all dealers, subject to subsequent elimination from eligibility of those found to have violated the rationing regulations. The suspension order is itself an allocation. Rationed commodities are allocated away from the violator for a period deemed reasonable under the circumstances, and at the same time the amount actually or potentially allocable to other and more trustworthy recipients of rationed commodities has been increased. A distributor of gasoline may be likened to a licensee whose license runs during good behavior.

In addition, if the authority to suspend be regarded as not expressly authorized by the statute, surely it may reasonably be implied. This reasonable implication could take two forms: (1) An authority which has often been implied in administrative

power to supplement a granted power in effectuating the purposes of the statute. Ware v. United States, 4 Wall. 617, 18 L.Ed. 389;[2] and (2) an implied authority to revoke or modify a license. Miami Beach Jockey Club v. Dern, 65 App.D.C. 369, 83 F.2d 715, certiorari denied 299 U.S. 556, 57 S.Ct. 17, 81 L.Ed. 409; Metropolitan Milk & Cream Co. v. City of New York, 113 App.Div. 377, 98 N.Y.S. 894, affirmed 186 N.Y. 533, 78 N.E. 1107; People ex rel. Lodes v. Department of Health, 189 N.Y. 187, 82 N.E. 187, 13 L.R.A.,N.S., 894; State ex rel. Nowotny v. Milwaukee, 140 Wis. 38, 121 N.W. 658, 133 Am.St.Rep. 1060.

■ The authority to issue suspension orders established, it is immaterial that the order may have penalizing consequences. The validity of the administrative exercise of a granted power is not impaired by consequences that collaterally may be of a punitive character. The fact that the exercise of the granted power may have penalizing effects which there was no statutory authority to impose affirmatively as punishment does not impair the validity of the exercise of the power. See United States v. One Ford Coupé, 272 U.S. 321, 328, 47 S.Ct. 154, 71 L.Ed. 279, 47 A.L.R. 1025; Hawker v. People of New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002.

■ The suspension order here involved, however, is not in the constitutional sense penal in its nature; it allocates; it controls, as specifically authorized by the statute, the "conditions" of eligibility for allocations; it revokes or modifies a license. None of these things primarily is penal. The purpose of the order is not to penalize but to remedy a disruption in the allocation program and to correct an improper diversion in the flow of scarce commodities occasioned by the violator's misuse.

The suspension orders involved in Wright v. Securities and Exchange Commission, 2 Cir., 1940, 112 F.2d 89; in Nichols & Co. v. Secretary of Agriculture, 1 Cir., 1942, 131 F.2d 651; and in Nelson v. Secretary of Agriculture, 7 Cir., 1943, 133 F.2d 453, though having penalizing effect, were specifically characterized by the courts as re-

medial rather than punitive. The word "penalty" is sometimes loosely used to include all actions which involve hurtful or disadvantageous consequences. Cf. Wilemon v. Brown, D.C.N.D.Tex., 51 F.Supp. 978. But if the word is used in that loose sense it has no legal significance in this case. Many an allocation of commodities on short supply involves a "penalty" (e. g., cutting the value of gasoline coupons or ration points), so that the same act can be an allocation and incidentally a "penalty" at the same time. Moreover, the revocation of a license is clearly a "penalty" in the loose sense referred to above. Yet it is not that kind of a penalty which may not be put into the hands of an administrative body without an unconstitutional delegation of legislative or judicial power. The incidental effect of hardship resulting from such suspension order can in no way detract from the essential nature of such order as the means of avoiding misuse in a critical field. War by its nature results in hardship. The power of Selective Service to draft available man-power is in no sense diminished by the inevitable hardship resulting to the individuals and families affected. The right of carrying on the peacetime pursuit of dealing in gasoline is no more vested.

■ It is not without significance that between May 31, 1941, the effective date of the Priorities and Allocations Act, and March 27, 1942, the date of the enactment of the Second War Powers Act, the administrative agencies charged with the administration of the allocation program construed Sec. 2(a) of the Priorities and Allocations Act to include the power to issue suspension orders and during that period had issued 13 suspension orders. Of this construction the Congress was fully apprised.[3] In Title III of the Second War Powers Act, Congress re-enacted without material change Sec. 2(a) of the Priorities and Allocations Act.

By the First Supplemental National Defense Appropriations Act, 1943, Act of July 25, 1942, Pub.Law 678, 77th Cong., 56 Stat. 704 et seq., Congress appropriated money to the Office of Price Administration for the purpose of carrying out the

---

[2] In this case the implied power of the Postmaster General to *discontinue* post offices under an express authority to *establish* post offices was upheld. Similarly, here the express power to allocate implies the power to withdraw allocations.

[3] See testimony of Attorney General Biddle before House Committee on Judiciary, Hearings before Judiciary Committee on Second War Powers Act, 77th Cong. 2d Sess., pp. 10, 11; see also S.Rep. 989, 77th Cong. 2d Sess.

provisions of the Priorities and Allocations Act, as amended by the Second War Powers Act. This appropriation was made after the Congress had been fully advised of the use of the suspension orders by the administrative agencies charged with the administration of the allocation program.[4]

Further, the legislative history of the Federal Reports Act of 1942, Pub.Law No. 831, 77th Cong., 2d Sess., C. 811, 56 Stat. 1078, 5 U.S.C.A. § 139 et seq., suggests that the Congress knew of the administrative construction that Sec. 2(a) of the Act authorized the suspension order in the furtherance of the administration of the allocation program.[5] Indeed in Section 8 of the Federal Reports Act, 5 U.S.C.A. § 139f, Congress dealt with the power of suspension and forbade its exercise in only one very special type of situation, in which it was deemed inappropriate.

This post-enactment legislative history is persuasive. It sheds light on the original intent of Congress. This is true because the events just described followed so soon after the enactment of the Priorities and Allocations Act and were participated in by many of the members who had their places in the enactment of the original legislation. The ready acquiescence in, and recognition of, the administrative practice which is here challenged indicates that this practice was something that Congress apparently contemplated all along as being within the granted authority. See generally United States v. Gordin, D.C.S.D. Ohio 1922, 287 F. 565, affirmed 6 Cir., 1925, 9 F.2d 394; Nagle v. Loi Hoa, 275 U.S. 475, 48 S.Ct. 160, 72 L.Ed. 381; Copper Queen Consol. Mining Co. v. Territorial Board, 206 U.S. 474, 27 S.Ct. 695, 51 L.Ed. 1143; Brewster v. Gage, 280 U.S. 327, 50 S.Ct. 115, 74 L.Ed. 457; McCaughn v. Hershey Chocolate Co., 283 U.S. 488, 51 S.Ct. 510, 75 L.Ed. 1183; United States v. Dakota-Montana Oil Co., 288 U.S. 459, 53 S. Ct. 435, 77 L.Ed. 893; Hartley v. Commissioner Internal Revenue, 295 U.S. 216, 55 S.Ct. 756, 79 L.Ed. 1399; Hassett v. Welch, 303 U.S. 303, 58 S.Ct. 559, 82 L. Ed. 858. If this had not been so, some remonstrance or criticism would have been natural and almost inevitable. The action taken by Congress may well be regarded as a ratification of the administrative practice even if it be assumed that the legislative language by itself and in the light of its history does not authorize the practice expressly or by implication. See Wells v. Nickles, 104 U.S. 444–447, 26 L.Ed. 825; Brooks v. Dewar, 313 U.S. 354, 61 S.Ct. 979, 85 L.Ed. 1399.

Plaintiff's attack upon the power of suspension and the procedure for its exercise, as being violative of Art. III of the Constitution is, essentially, an attack upon the accepted procedure of administrative agencies in which the functions of administration and adjudication are sometimes blended. That such blending alone is not sufficient to invalidate a hearing fairly conducted is well established. Wright v. Securities and Exchange Commission, 2 Cir., 112 F.2d 89; Nelson v. Secretary of Agriculture, 7 Cir., 133 F.2d 453.

The Hearing Commissioner and Hearing Administrator have not presumed to act as judges in the sense of the Constitution but have conducted themselves as delegates of the Administrator in determining whether an allocation away from a violator on the conditions imposed upon dealers in a war-scarce commodity is necessary or appropriate in the public interest and to promote the national defense. The Administrator has delegated to officers, divorced, as I understand it, from the customary enforcement functions of his agency, his duty to withdraw allocations from persons who have shown themselves to be irresponsible or untrustworthy. The withdrawal may be temporary (as here) or permanent, at least, for the duration of the war emergency. He has likewise set up an administrative procedure to accord a full and fair hearing for persons charged with violations of the conditions of their eligibility to continue dealing in rationed goods. This he has done so that an equitable system of allocation shall not work inequitably as to a particular individual. In the exercise of this function there is no exercise of the "judicial" power of the United States. See Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523. This court has the same right to review the determination of the Administrator to ascertain whether it is supported by substantial evidence as it has to review the orders of peacetime administrative agencies. I can not regard

---

[4] See House hearing on First Supplemental National Defense Appropriation Act, 1943, pp. 393, 394.

[5] See Congressional Rec., Nov. 27, 1942, p. 9476; Congressional Rec. Dec. 10, 1942, p. 9763.

the action by the Administration as a forbidden exercise of the judicial power.

I am not unaware of the conclusion of two District courts contrary to those I have expressed. See Wilemon v. Brown, D.C.N.D.Tex., 51 F.Supp. 978, decided September 29, 1943, and B. Simon Hdw. Co. v. Nelson, D.C.D.C., 52 F.Supp. 474, decided September 17, 1943. In those cases Judge Atwell and Justice Bailey expressed the view that the administrative body in entering a suspension order was attempting to discharge a judicial function, that the order was primarily penal and not remedial and Congress had conferred no power to punish. They were influenced by the decisions in Wallace v. Cutten, 298 U.S. 229, 56 S.Ct. 753, 80 L.Ed. 1157, and United States v. La Franca, 282 U.S. 568, 51 S.Ct. 278, 75 L.Ed. 551. I feel that such an order is primarily remedial and only incidentally punitive, and that under the power granted by Congress to the President or his delegate to allocate "on terms and conditions", the authority to suspend was granted. Wallace v. Cutten, supra, turned on a question of grammar—whether the present tense included the past. There the Secretary of Agriculture might suspend any person from trading in contract grain markets who "is violating" any provision of the Grain Futures Act, 7 U.S.C.A. § 1 et seq. The court, after pointing out that the act was evidently drawn with care, and that its language was plain and unambiguous, held there could be no doubt that Congress intended only to allow suspension of one who was currently violating the Act, and the power to suspend should not be implied as to one who more than two years before had been guilty of an infraction. United States v. La Franca, supra, had to do with taxes imposed under the National Prohibition Act, 27 U.S.C.A. § 1 et seq., double in amount to those theretofore exacted for legal sales. The court held the exaction was not a true tax but a penalty involving the idea of punishment for violation of the law. Cf., however, Magnano Co. v. Hamilton, 292 U.S. 40, 47, 54 S.Ct. 599, 78 L.Ed. 1109, and United States ex rel. Marcus v. Hess, 317 U.S. 537, 549, 553–554, 63 S.Ct. 379. See, also, Helvering v. Mitchell, 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917, in which it was said by Mr. Justice Brandeis, "Remedial sanctions may be of varying types. One which is characteristically free of the punitive criminal element is revocation of a privilege voluntarily granted."

What I have said in this opinion is not intended to extend beyond passing on the validity of suspension orders of the kind here considered and under the circumstances here shown to have been entered. The power of the OPA to impose money fines on violators of its regulations, either directly or under the name of voluntary (?) donations to the Treasury or to the Red Cross, and especially where the amount so to be paid bears no reasonable relation to any excessive profits charged and collected, and, therefore, not to be regarded as mere restitution, is not now before me; and presents a different and far more serious constitutional question. To purchase immunity from further investigation or prosecution, civilly or criminally, at a price is not ordinarily within the power of an administrative agency of the Executive Department.

The facts are stipulated and are made the findings of fact in this case.

My conclusion of law is that the injunction prayed for should be denied and the complaint dismissed.

Let a decree be presented.