STATE EX REL. GUIDE MANAGEMENT CORPORATION *v.* ALEXANDER, SECRETARY OF STATE, ET AL.

[No. 28,037. Filed February 14, 1945. Rehearing denied March 13, 1945.]

*Claude Cline,* of Huntington, for appellant.

*James A. Emmert,* Attorney General, *Frank Hamilton,* First Deputy Attorney General, *Cleon H. Foust* and *Thomas L. Webber,* Deputy Attorneys General, *John E. Scott,* of Indianapolis, *Thomas Emerson, Fleming James, Jr., David London,* and *Harold Craske,* all of Washington, D. C., for appellees.

RICHMAN, J.—Appellant seeks a writ of mandate against appellees to compel the transfer of a certificate

of title of a used automobile. The transfer would have been made in compliance with §§ 47-102 and 47-103, Burns' 1933, §§ 11101 and 11102, Baldwin's 1934, but for a directive issued by the Office of Price Administration, hereinafter called OPA. The directive, sub-section (h) (3) of Ration Order 5C, provides, with some qualifications irrelevant to this case, that when the title to an automobile is to be transferred the "transferror" shall surrender to his ration board unused gasoline ration coupons and secure a receipt (OPA Form R-569) in duplicate which he shall deliver to the transferree. Thereafter "the transferree of a motor vehicle, before registering the vehicle in any state for use, shall present the original copy of the receipt on Form OPA R-569 to the Registrar of Motor Vehicles (in Indiana the Bureau of Motor Vehicles). The duplicate copy of the receipt shall be submitted by the transferree of the motor vehicle to the Board pursuant to the provisions of S 1394.8017 at the time he applies for a ration for the vehicle." The Director of the Bureau of Motor Vehicles, acting under the Secretary of State, and in cooperation with OPA, instructed all branch managers, including appellee Robinson, that no application for transfer of title would be honored unless accompanied by said form. Appellant's refusal to present this form resulted in rejection of its application. This action followed.

The substance of appellant's specific contentions may be stated as follows: 1. The directive violates Art. I § 1 of the Constitution of the United States vesting all legislative power in the Congress. 2. It is *ultra vires,* that is, beyond the scope of the authority delegated to OPA and therefore conflicts with powers reserved to the states and the people as stated in the Tenth Amendment.

We shall not reach a third contention, namely, that the directive does not in terms nor by implication require the assistance of state officials in its enforcement; consequently they have no discretion but are bound to act under the statutes of the state.

The power to redelegate delegated authority is an unbriefed question which is suggested by a recital of the steps taken to get the legislative will of the Congress translated into the directive. They are as follows:

Section 201 (b) of "Emergency Price Control Act of 1942" [Pub. L. No. 421, 77th Cong., 2d Sess., c. 26; 56 Stat. 23; 50 U.S.C.A. Appx. § 921 (b)] authorizes the President to transfer to OPA any of the powers and functions relative to priorities or rationing conferred by law upon any other department or agency of the Government with respect to any commodity.

In § 2 (a) 2 of Title III of "Second War Powers Act of 1942" [Pub. L. No. 507, 77th Cong., 2d Sess., c. 199; 56 Stat. 176; 50 U.S.C.A. Appx. § 633] it is provided: " . . . Whenever the President is satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of any material or of any facilities for defense or for private account or for export, the President may allocate such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense."

Sub-division (8) of the same section reads: "The President may exercise any power, authority, or discretion conferred on him by this sub-section (a), through such department, agency or officer of the Government as he may direct and in conformity with any rules or regulations which he may prescribe."

By Executive Order No. 9125 (7 Federal Register 2719), the President conferred all his powers under Title III upon the Chairman of the War Production Board. Sub-division (3) of the same order provides that the Chairman of the War Production Board is authorized to delegate to the Office of Price Administration or the Price Administrator such of his functions, duties, powers, authority, or discretion with respect to priorities or rationing, as he may deem to be necessary or appropriate for the effective prosecution of the war.

The War Production Board by Supplementary Directive No. I H (7 Federal Register 3478) provided in part as follows: "In order to permit the efficient rationing of gasoline the authority delegated to the Office of Price Administration . . . is hereby extended to include the exercise of rationing control over the sale, transfer or other disposition of gasoline to any person . . ."

November 6, 1942, pursuant to this delegated authority, OPA issued Ration Order 5C (7 Federal Register 9135), with which we are now concerned.

These steps in the delegation down to the issuance of the directive were the same as those shown in *Perkins* v. *Brown, Administrator,* D.C. S.D. Ga. Savannah Division, 53 F. Supp. 176, 178, where it was held there was no unconstitutional delegation or subdelegation of legislative power. Similar steps were shown in *L. P. Stewart & Bro., Inc.* v. *Bowles, Price Administrator et al.,* U. S. Court of Appeals Dist. of Col., 140 F. (2d) 703, footnote 1, p. 704, where a suspension order with respect to rationing of fuel oil was sustained. This case went to the Supreme Court on certiorari and was affirmed with opinion May 22, 1944, 322 U.S. 398, 64 S.Ct. 1097, 88 L.Ed. 895. Mr. Justice Douglas states therein that the appellant conceded "that the President has validly dele-

gated to the Office of Price Administration whatever authority he has under § 2 (a) (2) of Title III of the Act." The opinions in *Perkins* v. *Brown, supra,* and the similar case of *United States* v. *Bareno*, D.C. D. Md., 50 F. Supp. 520, are in harmony with the rule stated in Horack's Sutherland Statutory Construction, § 312:

"The number of rule-making, administrative, and adjudicative functions which most administrative agencies must perform makes it impossible for a single executive officer or a board or commission to discharge these functions personally. Nevertheless, in many statutes it is customary to grant power directly to the executive head or the board or commission. If the statute expressly authorizes the redelegation to a subordinate official, the subdelegation is valid. Where the statute is silent on the question of redelegation and the delegation was to a single executive head, it is almost universally held that the legislature, understanding the impossibility of personal performance, impliedly authorized the delegation of authority to subordinates. . . . It is equally obvious that ministerial or administrative functions may be subdelegated for the ordinary board or commission could not personally perform the multitude of clerical, physical and nondiscretionary acts required of the usual administrative agency. Probably the most satisfactory rule in the subdelegation situation is this: Where the legislature intended that the exercise of a particular function should be performed by persons with special qualifications, then a subdelegation is invalid; but where no particular qualifications are necessary for the exercise of the function, then the exercise may be delegated to subordinate officials."

Since the Second War Powers Act expressly authorizes the delegation of the authority of the President

in the first instance and it is apparent that the inferior agencies to which the power was sub-delegated of necessity could not act through one individual especially selected because of peculiar qualifications, we have no doubt that the rule stated and applied in *Perkins* v. *Brown* and *United States* v. *Bareno* is equally applicable in the case at bar.

While there seems to be no pronouncement to date by the Supreme Court on the constitutionality of the Second War Powers Act, numerous inferior federal courts have spoken. Judge Parker of the 4th Circuit, sitting with two district judges, in *Carter v. Bowles*, 56 F. Supp. 278, decided July 14, 1944, used this language:

"We entertain no doubt as to the constitutionality of the statute. That the rationing of commodities necessary to the war effort is a proper exercise of the war power vested in Congress, and that the statute does not involve an unconstitutional delegation of legislative powers is too clear for argument. *Country Garden Market* v. *Bowles*, App. D. D., 141 F. (2d) 540; *United States* v. *Randall*, 2 Cir., 140 F. (2d) 70; *O'Neal* v. *United States*, 6 Cir., 140 F (2d) 908. See also *Brown* v. *Wright*, 4 Cir., 137 F. (2d) 484; *Henderson* v. *Kimmel*, D.C., 47 F. Supp. 635." In the O'Neal Case (certiorari denied, 322 U. S. 729, 64 S.Ct. 945, 88 L.Ed. 840), the court considers most of the contentions made herein by appellant, including the question of whether sufficient standards were provided by the statute, and concludes that the statute is constitutional. The case also sustains as valid the redelegation of the delegated authority. Such unanimity of opinion renders unnecessary further discussion of appellant's first contention and we pass to the second.

In the absence of express authority contained in the

Second War Powers Act, and the intermediate orders, conferring upon OPA the power or the duty to ■ interfere with a state function in transferring title to automobiles, the directive must be tested by the doctrine of implied powers. The power given to allocate gasoline would justify rationing or withholding altogether from private consumption. The policy adopted by OPA was to limit the consumption so that the owner of every automobile might have some gasoline for its use. The matter of ownership would therefore seem to be relevant to the adopted rationing method. We cannot be blind to the possibilities of abuse of rationing privileges, resulting in a so-called "black market." Were the transfer of automobiles permitted without regard to the issuance or surrender of coupons whereby gasoline for their use might be procured, the enforcement of regulations clearly within the power of OPA might be seriously hampered or destroyed. For a specific illustration assume that X, owner of an automobile, obtains a full C ration book today as a defense worker. Tomorrow he transfers his automobile to Y but does not surrender his C book. In a few days Y, another defense worker, procures a ration book and the next day makes a similar transfer to Z without surrendering his C book. Within a short time there will be outstanding the coupons for obtaining hundreds of gallons of gasoline, all issued for use in operating one automobile, thus destroying the efficiency and the effect of the regulations whereby an attempt was made equitably to distribute the available supply for civilian use. Under our statutes a motor vehicle may not be operated on the public highways unless it bears a license plate. The right to a license runs only to the owner of the vehicle and is dependent upon his registration thereof and the issuance of certificate of title. Rationing of

gasoline is for the use of a motor vehicle. If it cannot be used unless the owner has obtained certificate of title, obviously the issuance of the certificate bears a direct relationship to rationing.

A directive might have been so worded as merely to deny ration coupons to any one other than the owner. If he chose to abandon use of the vehicle, it would make no difference to OPA whether he had title or not. But with the shortage of motor vehicles it is apparent that the purchase of a car for storage, not for use, will rarely happen. The directive was made for application in ordinary or usual transaction, not for rare occasions. Under these circumstances it is not for the courts to substitute their methods of enforcing ration regulations for those thought by the administrative board to be reasonably necessary to accomplish their objectives. In Horack's Sutherland, § 5401, it is stated: "Thus the rule has become firmly established that an express grant of statutory power carries with it by necessary implication authority to use all reasonable means to make such grant effective." In § 5402 it is further stated:

"The reason behind the rule is to be found in the fact that legislation is enacted to establish broad or general standards. Matters of minor detail are frequently omitted from legislative enactments, and 'if these could not be supplied by implication the drafting of legislation would be an interminable process and the true intent of the legislature likely to be defeated.' "

Tested by these principles we cannot say that the part of the directive with which appellant refuses to comply is an unreasonable exercise of the powers of OPA. This view is supported by recent cases above cited wherein federal courts have sustained enforcement provisions of similar regulations.

From the conclusion that the directive was within the powers of OPA it must follow that appellant was bound thereby and it would seem to follow also that its refusal to comply therewith might be made the subject of a prosecution under the criminal sanctions of Title III of the Second War Powers Act. The question remains whether appellant, under these circumstances, has the right to invoke the extraordinary legal remedy of mandamus to assist in thwarting the directive by which it refuses to be bound. This subject is presented in the OPA brief wherein is cited *Western Union Tel. Co.* v. *State ex rel.* (1905), 165 Ind. 492, 76 N. E. 100. The court at page 495 of the opinion reviews the history of the writ and at page 512 quotes from *People, ex rel. Wood* v. *Board, etc.* (1893), 137 N. Y. 201, 204, 33 N. E. 145 as follows: "It is a remedial process and may be issued to remedy a wrong, not to promote one, to compel the discharge of a duty which ought to be performed, but not to compel the performance of an act which will work a public and private mischief, or to compel a compliance with the strict letter of the law in disregard of its spirit or in aid of a palpable fraud. The relator must come into court with clean hands. . . ." Again in *State ex rel* v. *Bigler* (1907), 169 Ind. 223, 82 N. E. 464, at page 228, the court says: "The writ will not issue to promote a wrong, or to compel a compliance with the strict letter of the statute in disregard of its spirit," and, the court concludes, 'when relator has purged itself of that which is objectionable in its manner of doing business, it will be time enough to seek the aid of the courts." These cases are in harmony with the law in most states. See 34 Am. Jur. *Mandamus* §§ 33, 34, and 35. We quote from the last section:

"It is an accepted doctrine that courts in the exercise of their discretionary power to issue extraordinary writs will look to the public interests which may be concerned. This is true where injunctive relief is sought, and is, with equal reason, a matter which will be taken into consideration in determining whether a writ of mandamus shall issue in a particular case. If public injury or embarrassment might result from issuance of the writ, the court may properly refuse it."

After the Congress declared in the Second War Powers Act of 1942 that the allocation of material was in the public interest, one of the first commodities to be allocated was gasoline. Collapse of the system under which it is rationed unquestionably would cause "public injury or embarrassment." If OPA thinks the directive necessary to prevent abuse of the rationing privilege and the Secretary of State considers the cooperation of the Bureau of Motor Vehicles in the public interest, surely this is no time for judicial interference by the extraordinary writ of mandate at the behest of a nonconforming plaintiff.

The judgment is affirmed.

O'Malley, C. J., not participating.

NOTE.—Reported in 59 N. E. (2d) 169.